Heather FENTON, Plaintiff–Appellant,

v.

HiSAN, INC., Defendant–Appellee.

No. 98–3322.

United States Court of Appeals,
Sixth Circuit.

Argued March 11, 1999.

Decided April 23, 1999.

Julia S. Wiley, Jacobson, Maynard & Tuschman, Toledo, OH, Charles P. Baither, III (argued and briefed), Robinson, Curphey & O'Connell, Toledo, OH, for Plaintiff–Appellant.

John T. Landwehr (argued), Michael J. Spisak (briefed), Eastman & Smith Ltd., Toledo, OH, for Defendant–Appellee.

Before: MERRITT, KENNEDY, and JONES, Circuit Judges.

## OPINION

MERRITT, Circuit Judge.

In this coworker sexual harassment case brought by plaintiff Fenton, the primary issues are whether her employer, HiSAN, Inc., discriminated against her by creating a hostile work environment and retaliated against her for complaining about the con-

duct of her coworker.[1] We agree with the district court that the employer is not liable and should be granted summary judgment.

## I. *Plaintiff's Sexual Harassment Claim*

Ohio discrimination law depends on federal case law. *See Delaney v. Skyline Lodge, Inc.*, 95 Ohio App.3d 264, 270, 642 N.E.2d 395 (1994). In *Burlington Industries v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998), the Supreme Court again held that an employer's liability in sexual harassment cases is governed by common law agency principles and specifically adopted section 219(2) of the Restatement (Second) of Agency as setting out the governing principles:

> "A master is *not subject to liability for the torts of his servants acting outside the scope of their employment,* unless:
> (a) the master intended the conduct or the consequences, or
> (b) *the master was negligent or reckless,* or
> (c) the conduct violated a non-delegable duty of the master, or
> (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, *or he was aided in accomplishing the tort by the existence of the agency relation.*"

Restatement (Second) of Agency § 219(2) (1985) (emphases added).

In *Ellerth*, the Supreme Court concluded that subsection (d)—and specifically the last clause thereof ("or he was aided in accomplishing the tort by the existence of the agency relation")—applies in supervisor harassment cases and therefore does not require a showing of negligence or reckless conduct under subsection (b) in order to bring the case within the supervisor's "scope of employment." Hence the Court concluded that employers may be held, subject to certain affirmative defenses, vicariously liable in supervisor sexual harassment cases. *See Ellerth*, 118 S.Ct. at 2267. But under the Supreme Court's reasoning in *Ellerth*, unlike a supervisor a coworker does not have power or authority emanating from the employer over the victim. Therefore since the "master" does not normally intend or abet the coworker's conduct (subsection (a)) or have a nondelegable duty to prevent it in all circumstances (subsection (c)), the liability of the employer in coworker cases is governed by subsection (b) of section 219(2) of the Restatement (Second) of Agency. The victim of coworker sexual harassment must therefore prove negligence by the employer. *See id.* This standard is consistent with the negligence standard we have previously employed in coworker harassment cases. In *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 872–73 (6th Cir. 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998), we stated that in coworker cases the standard is based on a "reasonableness" standard: "when an employer responds to charges of coworker sexual harassment, the employer can be liable only if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known."

Based upon *Blankenship* and the Supreme Court's opinion in *Ellerth*, we conclude that in order for a plaintiff to establish a *prima facie* Title VII claim of hostile environment sexual harassment by a coworker, she must demonstrate that the following elements of the statutory tort are present: (1) she was a member of a protected class; (2) she was subjected to un-

---

1. Fenton brought this action under Ohio law in the Court of Common Pleas of Hancock County (Ohio), asserting claims of hostile work environment sexual harassment, retaliation, and violation of Ohio's public policy forbidding both of the former. HiSAN removed the case to federal court based on diversity jurisdiction. After discovery, HiSAN filed a Motion for Summary Judgment, which the district court granted on February 19, 1998.

welcome harassment; (3) the harassment complained of was based upon sex; (4) the harassment unreasonably interfered with the plaintiff's work performance or created a hostile or offensive work environment that was severe and pervasive; *and* (5) the employer knew or should have known of the charged sexual harassment and failed unreasonably to take prompt and appropriate corrective action. It is clear under this standard that the employer should not be held liable for the coworker's conduct in this case. Plaintiff Fenton has not established the fifth element of a *prima facie* case against Defendant HiSAN.

■ Fenton was employed for six months in 1996 at Defendant's factory. She worked during the "B" shift from 3:00p.m. to 11:00p.m. Due to an increase in sales and the need for more prototype parts, the company decided to expand the number of positions in its prototype parts area, where its employees operate two programmable bending machines for the manufacture of such parts. On July 29, 1996, plaintiff and four other employees successfully bid for these new positions, which were to start on the "A" shift from 5:00a.m. to 3:00p.m. while successful bidders underwent training with the possibility of moving to the "B" shift depending on an employee's seniority. On August 26, 1996, plaintiff and the other new prototype parts workers began training in their area; all five worked the "A" shift under the supervision of Rebecca Shenk.

On or about the middle of the second week of September 1996, a coworker in this department named Charles Brown began making vulgar comments to Fenton. Brown made comments in front of other co-workers that if Fenton had any more children she would be wider than the Grand Canyon and that she would have to use shims off of one of the machines in the shop to make any man want her again; that he was going to call 1–900 numbers and "play with himself"; and that men "only want one thing from you." These comments continued during the following week when Brown said that Fenton is "sexy when she is angry"; that she should "stop showing off her f-ing ass"; and that a co-worker was tired because of the "wet spot women make on the bed." Throughout both weeks, Brown would hold up pictures from magazines and make comments like "look at those tits."

Plaintiff mentioned Brown's behavior to co-worker Dan Martin, who suggested that she report the situation to Martin's supervisor, Barb Rice. On October 3, 1996, plaintiff reported Brown's behavior to Rice, even though Rice was not plaintiff's own supervisor. Rice arranged a meeting that same day with plaintiff, herself, and Don Turner, Rice's supervisor and the plant superintendent. At approximately 11:00 a.m., they discussed the situation. Turner then reported the complaints to Lance Garceau, the Human Resources Manager.

Near the end of that same day, Rebecca Shenk told plaintiff she would be moved from the "A" to the "B" work shift. Shenk did not yet know about plaintiff's complaints against Brown. According to the testimony of Jon Miller, team leader in the prototype parts area, he and Shenk decided several days earlier—either on September 30 or October 1, 1996—that plaintiff and one other employee had been sufficiently trained in the operation of the factory's machines to be transferred to the "B" shift. Upon learning of her transfer, plaintiff asked Shenk whether she would be allowed to work her overtime hours before her shift and also asked for time to adjust her babysitting arrangements. Shenk told plaintiff she did not think that would be a problem and that plaintiff would start on the "B" shift the week of October 22, 1996. On October 3, 1996, plaintiff made arrangements with her daughter's babysitter to have her watch the baby during plaintiff's new hours on the "B" shift.

On October 4, 1994, the day following plaintiff's initial complaint to management, Garceau met with plaintiff to discuss

Brown's behavior. Garceau conducted an internal investigation and spoke with a number of individuals to determine if plaintiff's allegations were true. He also checked Brown's file and found only one disciplinary write-up arising from a complaint that Brown had spread a rumor that a coworker had come into work after having consumed alcohol.

On October 7, Brown himself—not plaintiff Fenton—informed Shenk that plaintiff had filed a charge against him. Shenk testified that this was the first time she had been made aware of plaintiff's complaints about Brown. On October 8, 1996, Brown's work station was changed from the prototype parts area to the "oven." Brown allegedly walked back to the parts area and made negative comments within earshot of plaintiff, describing his anger over the complaint against him. That same day, Garceau met with Brown and Shenk to discuss Brown's behavior toward plaintiff. Garceau informed Brown that he was to stop making offensive comments and that his failure to comply would result in disciplinary action. According to Shenk's testimony, Brown was noticeably quiet and concerned about his job after this meeting. Brown took vacation leave during the week of October 9, 1996.

Sometime between October 9 and October 11, 1996, Shenk informed plaintiff that she would not be able to come in early on the "B" shift, but would have to work the normal hours of 3:00 p.m. to 1:00 a.m. Management had decided that the overlap between the "A" and "B" shifts would be inefficient and therefore should be eliminated. Plaintiff, who had a small child, again contacted her babysitter to make appropriate arrangements; but the babysitter was unwilling to work past midnight and so plaintiff was unable to work out to her satisfaction an arrangement for day care.

On either October 10 or 11, 1996, plaintiff approached Garceau and asked to talk to him about her problems with Brown. On October 11, 1996, plaintiff put in her last day of work at Defendant's factory. On Monday, October 14, 1996, plaintiff called in sick. The next day plaintiff was scheduled to begin work at 6:00 a.m. She arrived one hour late and went to the Personnel Department to tender a letter of resignation. Plaintiff did not state that her reason for resignation was her day care problem. She stated that the reason for her resignation was that HiSAN had not solved the problem with Brown.

The immediate good-faith remedial action taken by HiSAN's supervisors—Rice, Turner, Garceau, and Shenk—all show the employer's intent to address plaintiff's complaints and to ameliorate the situation immediately. Defendant's response and remedy by no means manifested "reckless[ness]," Restatement (Second) of Agency § 229(2)(b) (1985), or "indifference or unreasonableness in light of the facts the employer knew or should have known," *Blankenship*, 123 F.3d at 873. Plaintiff has therefore failed to satisfy the fifth prong of the *Blankenship* test.

## II. *Plaintiff's Retaliation Claim*

██ Plaintiff Fenton claims that the company retaliated against her for complaining about sexual harassment by Charles Brown by transferring her to the "B" shift and by refusing to allow her to schedule her overtime hours at the beginning of her shift in order to accommodate the only arrangement she was able to make with her babysitter. In order to establish a *prima facie* case of retaliation, plaintiff must establish the following elements: (1) that she engaged in protected activity; (2) that defendant knew of this exercise of her protected rights; (3) that defendant consequently took an employment action adverse to plaintiff; *and* (4) that there was a causal connection between the protected activity and the adverse employment action. *E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858, 860 (6th Cir. 1997).

Plaintiff is unable to establish a *prima facie* case of retaliation in the instant matter. There is no doubt that plaintiff is able to satisfy the first prong of this Court's *Avery Dennison* test for retaliation—plaintiff's conversations with Barb Rice and her filing of a complaint about Brown's behavior are protected activity. *See* Order of Feb. 19, 1998, at 4–5. To satisfy the second prong, plaintiff must show that the defendant knew of her exercise of this protected activity. Although Fenton met with Rice and Don Turner, Rice's supervisor and the plant superintendent, she is unable to produce any evidence that the relevant management decision-makers who moved her to the "B" shift—Rebecca Shenk and Jon Miller—knew of her complaints about Brown when they decided to transfer her. Shenk testified that she was not informed of plaintiff's complaints until Brown himself mentioned them to her on October 7, 1996. According to Miller's testimony, he and Shenk decided either on September 30 or October 1, 1996, that plaintiff was sufficiently prepared to leave the "A" shift on which she was being trained and that she was to be transferred to the "B" shift. Moreover, plaintiff was aware when she bid on the prototype parts job that there was a strong likelihood that she would be transferred to the "B" shift. Four of the five employees who were selected for the parts area were transferred to the "B" shift. The fifth remained on the "A" shift based on her seniority. Therefore, with respect to plaintiff's claim that her transfer to the "B" shift constituted retaliation for her complaints against Brown, she has not met her burden of showing that her protected activity was known to those who made that decision. We note that the *Avery Dennison* test for establishing a *prima facie* case of retaliation is phrased in the conjunctive. All four prongs must be satisfied. Plaintiff thus has failed to set forth a *prima facie* case against defendant and we need not examine the remaining elements with respect to defendant's decision to transfer Plaintiff to the "B" shift.

Plaintiff also claims that defendant retaliated against her by not allowing her to work her mandatory overtime hours prior to, as opposed to at the end of, her normal "B" shift. Plaintiff claims the fact that this decision followed closely on the heels of her sexual harassment complaint demonstrates defendant's retaliatory intent. There is some dispute as to when defendant informed plaintiff of its decision on this matter. The district court found that this decision "was announced on October 8...." *See* Order of Feb. 19, 1998, at 5. By contrast, defendant maintains in its appellate brief that Shenk personally informed plaintiff of this decision "[s]ometime between October 9, 1996 and October 11, 1996...." *See* Brief of Def.-Appellee, at 11. While there is no mention of the precise date on which that decision was actually *made,* defendant does not dispute that it reached this management decision at some point *after* the relevant decision-makers had learned of plaintiff's complaints against Brown.

The fourth element of a *prima facie* case for retaliation is a causal connection between the alleged adverse employment action—the adjustment of overtime hours—and the plaintiff's complaints to the company. In *Moon v. Transport Drivers, Inc.,* 836 F.2d 226, 229 (6th Cir.1987), we stated that "the proximity in time between protected activity and adverse employment action may give rise to an inference of a causal connection.... However, temporal proximity alone will not support an inference in the face of compelling evidence" that the defendant company encouraged complaints about the relevant grievance. *Id.*

Plaintiff Fenton testified that during her initial orientation at HiSAN, Inc., she received and read the company's manual containing its policies concerning sexual harassment. *See* Deposition of Heather Fenton, at 23 (July 22, 1997) (J.A. 122). That manual provides, in pertinent part:

*EQUAL EMPLOYMENT OPPORTU-NITY*

. . . .

It is also Company Policy that our employees work in an environment that is free of sexual harassment. Sexual harassment can occur in various forms, but usually is deliberate or repeated un-solicited verbal comments, gestures, or physical contact or a sexual nature, which is unwelcome, or the use of implic-it or explicit coercive sexual behavior to attempt to control, influence, or affect the career, salary or job of another em-ployee. Employees who feel that they have been subjected to sexual harass-ment should immediately bring such matters to the attention of their Super-visor, or the Employee Relations Man-ager. Reports of this nature will be examined confidentially and impartially, and resolved promptly.

HiSAN, Inc. Employee Handbook, at 6 (J.A. 145, 151). In the instant matter, defendant was not oblivious to plaintiff's complaint. On the contrary, the manner in which the relevant management deci-sion-makers at HiSAN, Inc. handled the situation indicates that they considered it to be quite serious. This handling was consistent with the company policy enunci-ated in HiSAN's manual, which explicitly encouraged plaintiff to report such an inci-dent. *See id.*

■ When plaintiff on October 3, 1996, first approached a coworker with her com-plaints about Brown, he referred her to Barb Rice, his supervisor. Rice testified that plaintiff did not wish to take formal action at that time; rather, she simply wanted Rice to tell Brown to leave her alone. Rice, however, immediately took the matter to her supervisor, Plant Super-intendent Don Turner. Turner then re-ported the complaints to Human Re-sources Manager Lance Garceau, who on the following day met formally with plain-tiff to discuss her concerns about Brown's behavior. Garceau then conducted an in-ternal investigation and spoke with a num-ber of individuals to corroborate plaintiff's accounts of Brown's comments. More-over, on October 8, 1996, Brown's work station was changed from the prototype parts area to which Plaintiff had been as-signed. Later that day, both Garceau and Shenk met with Brown to discuss his con-duct and to make clear that any such future behavior would require disciplinary action against him. This series of events constitutes "compelling evidence" that the defendant company encouraged complaints about the relevant grievance, *Moon,* 836 F.2d at 229, and handled plaintiff's com-plaints in a manner consistent with its explicitly stated company policies. In light of the fact that plaintiff presents no other evidence to establish a causal connection between her protected activity and the company's allegedly adverse employment action, any inference arising from the proximity of these events is negated. *See id.* Plaintiff has not carried her burden of proving the fourth prong of the *Avery Dennison* test. Accordingly, her attempt to establish a *prima facie* case of retalia-tion necessarily fails. *See E.E.O.C. v. Avery Dennison Corp.,* 104 F.3d 858, 860 (6th Cir.1997). Assuming a *prima facie* case, as found by the district court, *see* Order of Feb. 19, 1998, at 6, we do not disagree with the court below that plaintiff was not allowed to begin her shift early due to the waste and inefficiency caused by overlapping shifts, when having more than the normal number of workers in the pro-totype parts area at one time would be counterproductive because there are a lim-ited number of machines to work on and a limited amount of space. No other em-ployee's schedule is accommodated in such a way, and if plaintiff were allowed to start work early, all other employees would be entitled to the same accommodation. Hav-ing set forth a legitimate non-discriminato-ry reason for its decision regarding plain-tiff's overtime, the burden shifted once again to plaintiff, who had to prove by a preponderance of the evidence that the defendant's proffered reason was pretextu-al. The district court found that plaintiff

was unable to carry this burden, and thus granted defendant's Motion for Summary Judgment on the retaliation claim. *See* Order of Feb. 19, 1998. We agree.

### III. *Plaintiff's Public Policy Claim*

Plaintiff further contends that defendant HiSAN violated public policy because sexual harassment and retaliation are contrary to the public policy of the State of Ohio. However, this claim is naturally derivative of plaintiff's first two claims and so it too must fail.

For the foregoing reasons, the judgment of the district court is AFFIRMED.