**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0542n.06
Filed: September 4, 2008

**No. 07-6089**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| DONNA MULLINS, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| GOODYEAR TIRE & RUBBER CO., | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

_____

BEFORE: KEITH, GRIFFIN, and GIBSON, Circuit Judges.[*]

GRIFFIN, Circuit Judge.

Plaintiff sued her former employer alleging sexual harassment based on the actions of two coworkers. The district court ruled that the sexual harassment created a hostile work environment, but granted summary judgment in favor of defendant on the basis that its response to plaintiff's complaint was reasonable. Because we hold that defendant's remedial action to plaintiff's complaints of sexual harassment did not constitute "indifference or unreasonableness," we affirm.

I.

Plaintiff Donna Mullins was employed by defendant Goodyear Tire & Rubber Company as a "bead operator," responsible for operating machinery that produces tire beads. (JA 56-57.) Her

---

[*]The Honorable John R. Gibson, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

lawsuit against Goodyear concerns the actions of two of her former coworkers, Bill Jones and Autry "Red" Parker. Jones was the union-elected "lead hand" for the shift, meaning that he had some administrative duties but did not have supervisory authority over Mullins and her coworkers. (JA 68, 80.) Parker was the "balance crew" employee whose job was to cover for employees who were on break or otherwise absent. (JA 63.) Although Mullins mentions both Jones and Parker in her complaint, on appeal Mullins does not argue that defendant's remedial measures taken regarding Jones were legally insufficient. Rather, in her appellee brief and at oral argument, she concedes that her appeal is limited to defendant's response to Parker's actions. (Blue Br. 24 n.13.) Therefore, we focus solely on defendant's remedial actions regarding Parker.

Mullins claimed that Parker made threatening remarks and engaged in aggressive behavior. Parker allegedly said to her that because he had served in Vietnam, "it would be nothing for me to kill someone." (JA 256.) Parker also sabotaged plaintiff's machine on several occasions. He placed half-empty spools of wire on the machine, causing Mullins to have to change spools more than usual, and tightened a bolt on her machine to the point where the machine was inoperable until a coworker repaired it. She also alleged that Parker told her that "if you weren't married, you're a good looking woman, I'd give it a try." (JA 391.)

Mullins complained to Human Resources, who then met with Parker. Parker was told not to bother plaintiff and to be in the bead area only when he had work to do there. Plaintiff admits that after the meeting, Parker did not say anything inappropriate to her during the times that he came into

the bead area. (JA 107-08.) However, plaintiff reported that Parker was in her area more than he needed to be. (JA 390.)

On her final day of work, plaintiff alleges that Parker drove his forklift within inches of the cart where she placed her beads, and stood outside the break room, partially blocking her exit. (JA 390.) Thereafter, Mullins did not return to work, took medical leave the next day, and terminated her employment.

Mullins sued Goodyear in the United States District Court for the Western District of Tennessee, alleging sexual harassment in violation of the Tennessee Human Rights Act, TENN. CODE ANN. § 4-21-101, et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.[1] The district court granted defendant's motion on the basis that its remedial actions were reasonable. (JA 404.) Mullins timely appealed.

II.

On appeal, Mullins asserts that instead of applying the "indifference standard" from *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868 (6th Cir. 1997), the district court should have applied the "negligence standard" of *Fenton v. HiSAN, Inc.*, 174 F.3d 827 (6th Cir. 1999). Mullins argues further that, regardless of whether the court uses a negligence or an indifference standard, she has presented sufficient evidence to submit the case to a jury.

---

[1]The THRA is a state law analogue to Title VII and the statutes are analyzed identically. *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 n.1 (6th Cir. 2008) (citing *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996)).

We review a district court's grant of a motion for summary judgment de novo. *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 374 (6th Cir. 2007). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party has the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When determining whether the nonmovant has met this burden, we view the evidence in the light most favorable to the nonmoving party. *Smith Wholesale Co., Inc. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 861 (6th Cir. 2007).

In granting defendant's motion for summary judgment, the district court applied the test enumerated in *Blankenship* for employer liability for coworker sexual harassment. (*See* JA 386.) To prevail on such a claim, a plaintiff must prove that: "(1) she is a member of a protected class; (2) she was subject to unwelcomed sexual harassment; (3) the harassment was based on her sex; (4) the harassment unreasonably interfered with her work performance and created a hostile work environment; and (5) [defendant] knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Id.* (quotation marks and citation omitted); *see also* Title VII of the Civil Rights Act of 1964, § 704(a)(1), 42 U.S.C. § 2000e-2(a)(1). The sexual harassment in *Blankenship* involved a coworker, and we noted that hostile work environment cases make a distinction between sexual harassment caused by supervisors and sexual

harassment caused by coworkers.[2]  *Blankenship*, 123 F.3d at 872 (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 803-04 (6th Cir. 1994)).  When dealing with allegations of coworker sexual harassment, the "act of discrimination by the employer in such a case is not the harassment, but rather the inappropriate response to the charges of harassment."  *Blankenship*, 123 F.3d at 873.

Goodyear moved for summary judgment on the final element,[3] arguing that Mullins did not show that it was liable for Parker's actions.  In order for an employer to be liable for a coworker's sexual harassment, a plaintiff must prove that the employer both (1) knew or should have known of the harassment, and (2) failed to take prompt and appropriate corrective action.  *Hafford*, 183 F.3d at 513 (citing *Pierce*, 40 F.3d at 804); *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498 (6th Cir. 2001).  Thus, in *Blankenship*, we held the employer accountable for its own response to the complaint of sexual harassment:

> Once an employer is aware of and responds to charges of sexual harassment, though, mere negligence as to the content of the response cannot be enough to make the employer liable.  When an employer responds with good-faith remedial action, we

---

[2]The claim in *Blankenship* was against a coworker who "had no supervisory power" over the plaintiff.  *Blankenship*, 123 F.3d at 872.  Similarly, in the present case, it is undisputed that Parker had no supervisory authority over Mullins.  (JA 395 n.2.)

[3]Goodyear also moved for summary judgment on the fourth element, asserting that plaintiff did not demonstrate that the actions were sufficiently severe or pervasive so as to alter the terms and conditions of her employment.  (JA 391.)  However, the district court refused to grant summary judgment on this ground, ruling that "Plaintiff has pointed to evidence in the record which would allow the trier of fact to find that 'the charged sexual harassment had the effect of unreasonably interfering with [plaintiff's] work performance and creating an intimidating, hostile, or offensive environment . . . .'"  (JA 392 (quoting *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 619-20 (6th Cir. 1986).)  On appeal, Goodyear does not contest this ruling, and therefore the issue of the fourth element of plaintiff's cause of action is not before us.

> cannot say that the employer has itself committed an act of discrimination . . . . When an employer implements a remedy, it can be liable for sex discrimination in violation of Title VII only if that remedy exhibits such indifference as to indicate an attitude of permissiveness that amounts to discrimination.

*Blankenship*, 123 F.3d at 873.

On appeal, plaintiff argues that the district court applied the wrong test in analyzing the sufficiency of Goodyear's corrective action. The heart of the controversy surrounds the district court's use of the "indifference standard" as described in *Blankenship*. In *Blankenship*, we held that an employer is liable for coworker harassment if "its response manifests *indifference* or unreasonableness in light of the facts the employer knew or should have known." *Id*. at 873 (emphasis added). Mullins argues that, subsequent to *Blankenship*, we adopted a negligence standard in *Fenton v. HiSAN, Inc.*, 174 F.3d 827 (6th Cir. 1999). After a careful comparison of the two cases, we conclude that *Fenton* did not overrule the *Blankenship* test; it merely restated it. Indeed, the holdings of published decisions of this court are precedentially binding on subsequent panels and may be overruled only by the court en banc. 6TH CIR. R. 206(c); *see also United States v. Yoon*, 398 F.3d 802, 806 (6th Cir. 2005); *Darrah v. City of Oak Park*, 255 F.3d 301, 309 (6th Cir. 2001).

*Fenton*, like *Blankenship*, involved allegations of coworker sexual harassment. The *Fenton* court reiterated the notion that an employer's liability in instances of coworker harassment is based on its response to the reported sexual harassment: an employer is liable if it does not respond in a "reasonable" manner. *Fenton*, 174 F.3d at 829-30. In *Fenton*, we summarized a plaintiff's burden in coworker harassment cases by stating that a "victim of coworker harassment must therefore prove

negligence by the employer." *Id.* at 829. The *Fenton* panel purportedly applied the *Blankenship* rule:

> This standard is consistent with the negligence standard we have previously employed in coworker harassment cases. In [*Blankenship*], we stated that in coworker harassment cases the standard is based on a "reasonableness" standard: "when an employer responds to charges of coworker sexual harassment, the employer can be liable only if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known."

*Id*. at 829 (citing *Blankenship*, 123 F.3d at 872-73).

Because the *Blankenship* court phrased "indifference or unreasonableness" in the conjunctive, we view it as a unitary standard. If an employer acts "unreasonably," it fits the classic common law definition of negligence. *See* RESTATEMENT (SECOND) OF TORTS § 282 (observing that "negligence is conduct which falls below the standard established by law for the protection of others against *unreasonable* risk of harm." (emphasis added)). Similarly, if an employer's response to reported coworker harassment is "indifference," then the employer has not reacted reasonably and has thus committed an act for which liability may attach under Title VII. *See Fuller v. City of Oakland*, 47 F.3d 1522, 1529 (9th Cir. 1995) ("Title VII does not permit employers to stand idly by once they learn that sexual harassment has occurred. To do so amounts to a ratification of the prior harassment.").

The Supreme Court has not directly addressed the standard needed to establish liability in coworker sexual harassment cases. However, it has repeatedly addressed the standard for liability in cases involving sexual harassment by supervisors. Although these cases are distinguishable and require a different analysis, *see Pierce*, 40 F.3d at 872, two post-*Blankenship* cases have caused some

confusion regarding the continued viability of the *Blankenship* standard. In *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), the Supreme Court held that employers may be vicariously liable for the sexual harassment committed by supervisors. *Faragher*, 524 U.S. at 807. In *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), released the same day as *Faragher*, the Court held that an employer may be liable for sexual harassment by supervisory employees when the employer's own negligence contributed to the harassment. *Ellerth*, 524 U.S. at 758-59.

Although these cases did not address coworker sexual harassment, a panel of this court, in dicta in an unpublished opinion,[4] suggested that *Faragher* and *Ellerth* may have overruled *Blankenship* insofar as they held that an employer is not liable for "mere negligence." *Collette v. Stein-Mart, Inc.*, 126 F. App'x 678 (6th Cir. 2005) (unpublished). To resolve any confusion, we recently affirmed the continued viability of *Blankenship* in a published decision. In *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321 (6th Cir. 2008), we addressed this issue directly:

> For the sake of clarity, we note that although this court's decision in *Blankenship* has been modified by the Supreme Court's decisions in *Faragher v. City of Boca Raton*, 524 U.S. 775, 780 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 758-59 (1998), *Blankenship* remains good law for the proposition that a company may be held liable for coworker harassment if its "response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Blankenship*, 123 F.3d at 873.

*Hawkins*, 517 F.3d at 339.

---

[4]Unpublished opinions of this court are not precedentially binding under the doctrine of stare decisis. *United States v. Lancaster*, 501 F.3d 673, 677 (6th Cir. 2007); *United States v. Sanford*, 476 F.3d 391, 396 (6th Cir. 2007).

Thus, *Hawkins* removed any doubt that the *Blankenship* standard survives, and the district

court was correct in applying *Blankenship* to analyze plaintiff's allegations of coworker sexual

harassment. Having determined that the district court applied the correct standard, we now address

plaintiff's argument that the district court's analysis reached the wrong result.

III.

Plaintiff contends that the district court erred by granting summary judgment in favor of

defendant because she presented evidence that "is sufficient for a jury" to find her employer liable

for the coworker sexual harassment. (Blue Br. 24.) We disagree. Like the lower court, we view the

evidence in the light most favorable to plaintiff to determine whether a reasonable juror could

conclude that Goodyear reacted with "indifference or unreasonableness" towards plaintiff's

complaint of coworker sexual harassment.

Plaintiff argues the following:

(A) Defendant knew Plaintiff had good reason to fear Parker; (B) Defendant therefore
promised Plaintiff that she would be *completely* separated from Parker; (C)
Defendant breaks this promise and fails to follow through on its remedial measures
by delivering no discipline to Parker, no separation, and no meaningful monitoring;
(D) to no avail, Plaintiff complains of continued stalking and harassment by Parker
with a forktruck; and (E) Plaintiff finally succumbs to a nervous breakdown due to
Parker's continuing stalking and harassment.

(Blue Br. 24.) We address each in turn.

First, plaintiff claims that Goodyear knew that she had "good reason" to fear Parker. The

record shows that the only actions that Mullins reported to management initially were the three

incidents of alleged sabotage of plaintiff's machine (incidents that she attributes to Parker), plus

Parker's comment about serving in Vietnam. (JA 303.) Most importantly, none of these incidents involved sexual harassment. Moreover, Goodyear reacted immediately, launched a two-week investigation, interviewed the parties involved, and instructed Parker not to bother Mullins and to avoid the bead area when it was not necessary for him to be there. (JA 182.) When reviewing an employer's response to determine if it expresses "indifference or unreasonableness," we have held that it is generally adequate if it is "reasonably calculated to end the harassment." *Jackson v. Quanex Corp.*, 191 F.3d 647, 663-64 (6th Cir. 1999); *Hawkins*, 517 F.3d at 340. Plaintiff complained of Parker tampering with her machine and making a comment that frightened her. We agree with the district court that by instructing Parker not to bother Mullins, and to avoid spending unnecessary time in the bead area, Goodyear acted in a reasonable manner.

Second, plaintiff claims that Goodyear breached a promise that she would be completely separated from Parker. (Blue Br. 26.) The record shows that Parker returned to the bead area from time to time. Although Mullins stated that Parker's "presence bothered me," she admitted that he did not engage in any sexually harassing or inappropriate conduct. (JA 108.) Absent evidence of continued sexual harassment, we are unwilling to impose liability on Goodyear for failing to keep Parker and Mullins separated . *See Martin v. Boeing-Oak Ridge Co.*, 244 F. Supp. 2d 863, 875 (E.D. Tenn. 2002) ("The issue is not whether plaintiff finds the response by defendant satisfactory but whether defendant's response was appropriate."). In the instant case, Goodyear's response appears not only reasonable but effective in ending the sexual harassment.

Plaintiff's third argument fails for similar reasons. She argues that Goodyear breached a duty by not disciplining Parker. However, as we explained above, Goodyear responded reasonably to end the sexual harassment, thus meeting its obligations under Title VII. *See Blankenship*, 123 F.3d at 874 ("a harassment victim may not dictate an employer's action against a co-worker."); *see also Anderson v. Memphis City Schools Bd. of Ed.*, 75 F. Supp. 2d 786, 792 (W.D. Tenn. 1999) ("a plaintiff will not prevail simply because the remedy offered by defendant was not what plaintiff wanted." (citing *Bell v. Chesapeake & Ohio Ry.*, 929 F.2d 220, 225 (6th Cir. 1991))).

Next, Mullins takes issue with the district court's conclusion that she did not complain about continued harassment. Although Mullins argues that she complained after her initial meeting with Human Resources, the only incidents mentioned in her brief involve Parker's presence in the bead area, not his conduct. Goodyear had a duty to take reasonable measures to prevent continuing sexually harassing conduct, but Title VII did not require it to ensure that Mullins and Parker were separated at all times. *See Blankenship*, 123 F.3d at 871-74.

Furthermore, even if Parker intentionally entered the bead area, or drove his forklift near Mullins, there is no evidence that he did so because of plaintiff's sex. In this regard, "Title VII is not a generic anti-harassment statute." *Harbert-Yeargin*, 266 F.3d at 520 (Guy, J. concurring). In order to be actionable under Title VII, the harassment must be "based on sex." *Hawkins*, 517 F.3d at 332. If Parker entered the bead area to annoy Mullins, such action might have been rude and inappropriate, but it does not give rise to a Title VII claim unless Parker did so because of plaintiff's gender. We find nothing in the record to support such a conclusion.

Finally, plaintiff alleges that on her last day on the job, Parker drove his forklift dangerously close to her and blocked her in the break room. (JA 268-71.) Mullins claims that these incidents caused her to suffer a nervous breakdown and promptly terminated her employment. (Blue Br. 36-38.)

"[E]mployer liability in cases of coworker harassment is not derivative, but instead depends on the employer's 'own acts or omissions.'" *Hawkins*, 517 F.3d at 340 (quoting *Blankenship*, 123 F.3d at 873). As stated above, an employer may be liable for the sexually harassing conduct of its non-supervisory employees if its response to a complaint "manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Blankenship*, 123 F.3d at 873; *Hawkins*, 517 F.3d at 339. However, Goodyear did not have the opportunity to address plaintiff's final working-day concerns. Accordingly, we cannot conclude that Goodyear acted with "indifference or unreasonableness" in response to events to which it was not given an opportunity to respond.

IV.

For the reasons described above, we affirm the judgment of the district court.

**DAMON J. KEITH, Circuit Judge, dissenting**. I strongly disagree with the majority's decision to affirm the district court's dismissal of this sexual harassment claim on summary judgment. It is unclear whether the majority, determined to allow Defendant Goodyear Tire & Rubber Co. to escape liability for the egregious and frankly disgusting sexual harassment suffered by Plaintiff Donna Mullins, ever read the record in this case. While the majority correctly states the standard of review for summary judgment, in its reasoning, the majority ignores key facts and incorrectly views the evidence in the light most favorable to the *moving* party. Because I believe that there are material facts sufficient to raise a question for the jury, I **dissent**.

I.

The district judge in this case made a specific finding that "Plaintiff [Donna Mullins] has pointed to evidence in the record which would allow the trier of fact to find that 'the charged sexual harassment had the effect of unreasonably interfering with [the plaintiff's] work performance and creating an intimidating, hostile, or offensive working environment.'" (J.A. 392) (quoting *Rabidue v. Osceola Refining Co.*, 805 F.3d 611, 619-20 (6th Cir. 1986)). Because the majority omits and glosses over the harassment that Mullins endured, it is necessary to recount the facts separately.

Mullins was the only woman working on her shift at Goodyear's tire manufacturing plant in Union City, Tennessee, which employs over 2,200 individuals. (J.A. 62, 211.) From about 1999 to October 27, 2005, Mullins worked primarily as a bead operator.[5] (J.A. 54-58.)

---

[5]Bead operators set up and operate machinery that produce tire beads. (J.A. 56-58.)

The Goodyear employees who allegedly harassed Mullins are Autry Lee Dale "Red" Parker and William "Bill" Jones. Parker and Jones were nonsupervisory employees who worked with Mullins. Jones was elected as a "lead hand," (J.A. 70) whose special duties included administrative tasks, such as administering vacation and overtime and ordering supplies. (J.A. 68-69, 212.)

Over the years, Jones engaged in sexually inappropriate behavior towards Mullins. (J.A. 392-93.) Jones's treatment of Mullins, however, worsened after Jones was elected lead hand. (J.A. 78-88.) In addition, Parker allegedly engaged in hostile behavior towards Mullins,[6] including sabotaging her machine on several occasions. (J.A. 89-90, 93-99.) The district court, finding that Mullins presented sufficient evidence to convince a jury that the sexual harassment was sufficiently "severe and pervasive," summarized the alleged facts as follows:

> Bill Jones refused [Mullins] vacation days, scheduled male workers ahead of her, and would write himself ahead of her even though he was not on the books; although Jones was a relief man who was supposed to relieve the bead unit operators, such as [Mullins], when they needed a break, he purposefully relieved [Mullins] late for breaks and, when [Mullins] was on a break, he would leave early; Jones timed [Mullins'] bathroom breaks, but not the bathroom breaks of male workers; Jones

---

[6]Mullins testified that she was particularly fearful of Parker because he would brag to her about killing people in Vietnam. (Mullins Depo., J.A. 256.) In her affidavit, she recounted that:

> Red Parker told me on numerous occasions that he served in Vietnam and that it would be "nothing for me [Parker] to kill someone." This frightened me because I did not know what he was insinuating. I did not know whether to believe he was crazy or if he was purposefully trying to scare or intimidate me. He is about 6'3" and I estimate he weighs about 350 lbs or more.

(J.A. 303.) Mullins also told Ray Stevenson, a Goodyear human resources official, that Parker was the type of man who might open fire in a public place like McDonald's. (J.A. 256.) According to Mullins, Stevenson responded, "She is telling the truth. That is exactly the type of man this is." (J.A. 256-57.) Harris, another Goodyear official who was present at the meeting, testified that he did not remember Mullins reporting Parker's statements about killing people. (J.A. 208.)

made sexual references about [Mullins'] breasts "hundreds of times" on a daily basis and, on one occasion, pulled her shirt out; he also hugged her on a weekly basis until she struggled out of it; Jones "lurched" at [Mullins] in an "attack fashion" and had to be restrained by another man; Jones laughed, stared, and pointed at [Mullins] while she was working; Jones cursed at [Mullins] and called her names such as "lazy bitch"; Jones complained to the male workers about [Mullins'] job performance; Jones purposefully shut down [Mullins'] machine and submitted a false work order so that he would not have to change a wire on [Mullins'] machine; Jones grabbed [Mullins] on one occasion and kissed her on the cheek as she tried to get away; when [Mullins] needed tools for a job and had to ask Jones, who was the lead hand, Jones would give her the "third degree"—asking her questions about why she needed it, in contrast to how he treated the men; when Jones left [Mullins'] machine early when he relieved her, he did not advise her of the status of her machine, if anything was wrong, and would not assist her in fixing things that went wrong; instead of handing [Mullins] her paycheck, Jones put it on the edge of a book near four fans while handing the men their checks by normal distribution; when [Mullins'] schedule was changed by Bone, Jones did not inform her of the change; Parker changed out [Mullins'] spools to cause her more work and tampered with [Mullins'] gauges which he did not do to the male workers; Parker tightened a bolt on [Mullins'] machine so tight that neither she, Ricky Davis, or Jackie Bone could loosen it; Parker told [Mullins] on numerous occasions that he served in Vietnam and that it would be "nothing for me to kill someone"; during the investigation, Parker came to [Mullins'] department every day even though he was supposed to be staying away; after the investigation, Parker drove a fork truck within an inch of [Mullins] while she worked her bead unit, thus scaring her; Parker and Jones, together, came into the break room while [Mullins] was there and partially blocked the door, forcing [Mullins] to squeeze by them.

(J.A. 392-94.) In addition, Parker made statements to Mullins, such as "if you weren't married, you're a good looking woman, I'd give it a try," (J.A. 91), and Jones told her, "[W]hy don't you show me your boobs." (J.A. 75.)

On September 19, 2005, Mullins told Bone that she wanted a meeting with Human Resources to discuss the alleged harassment by Parker and Jones. Mullins reported the most recent sabotage of her machine and other workplace incidents to James Harris, a Goodyear manager. (J.A. 78-79,

104, 190-93.) Although she tried to report Jones's sexual behavior, beginning by saying that she and

Jones "had issues for years," (J.A. 78, 116), Harris abruptly cut her off, saying, "Let's just take care

of the issue at hand." *Id.* Mullins identified two potential witnesses to Parker's sabotage of her

machine. (J.A. 193.) Goodyear initiated an investigation and temporarily separated Parker from

Mullins. (J.A. 182.) As part of Goodyear's investigation, Parker, Jones, and the two witnesses were

interviewed. (J.A. 166-67, 193-203.) Although Parker and Jones denied most of the allegations,

Parker admitted to putting partial rolls of wire on her bead unit, thereby forcing Mullins to change

rolls more frequently. (J.A. 194.) Parker's alleged reason for doing this was "because [the rolls]

were dirty, had rust, and they needed to be used up." (J.A. 195.) Eddie Holland, a worker in the

bead unit, confirmed that Parker had replaced the rolls on Mullins' machine. (J.A. 199.) In addition,

Ricky Davis, another co-worker, contradicted Parker's alleged business purpose for changing the

rolls, telling Goodyear that "Parker told [Davis] that he was taking the partial rolls and putting them

on [Mullins'] machine on purpose, so that she would have to do more changeovers."[7] (J.A. 200-01.)

When Goodyear interviewed Jones, he admitted to leaving Mullins' machine early when relieving

Mullins on break, but claimed "that the reason why he left is because she was staying on break for

so long." (J.A. 167.) Jones also "admitted that he . . . was monitoring her break time." (J.A. 197.)

Despite Parker's and Jones's admissions and the fact that two co-workers corroborated Mullins'

---

[7]In his deposition, Davis testified that Parker "was just laughing at how–that he pulled the almost-empty rolls and put on her machine, so she'd have to change them." (J.A. 350.)

report, Goodyear concluded that the conflict about which Mullins complained was simply a normal co-worker conflict and not gender-based harassment. (J.A. 157-61.)

Goodyear met with Mullins to inform her of their findings and to scrutinize her work habits, advising her not to take so long when using the bathroom. (J.A. 160.) Summarizing the results of his investigation, Harris told Mullins that "there was [sic] no substantial findings," (J.A. 158), and that "[h]e found no evidence that the machine had been tampered." (J.A. 159.) Even though Goodyear admitted that Mullins' work was "average," Goodyear determined that her conflict with other coworkers might have been because she was not "busy" enough and her mind might have been "wander[ing]." (J.A. 161.) Rather than conducting a meeting that would address Mullins' concerns, "it turned into a [Mullins] defending [herself] meeting." (Mullins Depo., J.A. 266.) "It turned into a why are you not getting enough beads, and we have someone tell us that you do take long bathroom breaks" meeting. (Mullins Depo., J.A. 265-66.)

Neither Jones nor Parker were ever disciplined. (J.A. 328.) Even though Goodyear found two witnesses who corroborated Mullins' account of Parker deliberately changing spools on Mullins' machine in order to make her work more difficult, Goodyear never told Parker that he engaged in inappropriate behavior.[8] (J.A. 174.) Whereas Griffith, a Goodyear manager, claimed in his

---

[8]Griffith testified as to his post-investigation meeting with Parker as follows:
Q.  . . . did you tell [Parker] that Goodyear had found that he engaged in any kind of inappropriate behavior?
A.  No.
Q.  Did Harris tell [Parker] that Goodyear had found that?
A.  No.
Q.  Had Goodyear made any findings in that regard?

deposition that the separation between Parker and Mullins was lifted after the investigation (J.A.175, stating that the "restriction had been lifted"), James Harris, another manager, testified that the separation had never been lifted. (J.A. 206.) Likewise, Mullins testified in her deposition that Ray Stevenson, a Goodyear human resource official, told Mullins that Parker would be kept away from Mullins' work area. (J.A. 259.) Griffith, however, instructed Parker that it "was okay to go back in that area and work, but he needed to limit his dealings with [Mullins]." (J.A. 327.)

Two supervisors, Griffith and Jackie Bone,[9] spent more time in the bead area monitoring the situation. (J.A. 170-71.) According to Griffith, he followed up with Mullins on numerous occasions, and Mullins told him that "it was better." (J.A. 170-72.) In contrast, Mullins claims that things were not better because Parker continued to lurk in her work area, "constantly walking back and forth behind [her]." (J.A.117.) Bone admitted that Mullins complained to him every time Parker came into the bead area, but said that he decided not to report her complaints to anyone else. (J.A. 183.)

Parker continued to spend time in Mullins' work area despite Mullins' repeated complaints about the lack of separation. (J.A. 183.) In addition, Parker began driving his equipment

---

A.    Any inappropriate?  No.
Q.    Right. Any inappropriate behavior, such as tampering with her gauges, sabotaging her machine, *trying to make her work purposely more difficult*?
A.    No.
(J.A. 174) (emphasis added).

[9]Bone was the Area Manager for the bead unit, as well as two other departments, making him the direct supervisor of Mullins, Parker, and Jones. (J.A. 55.)

dangerously close to her, and Mullins complained about this practice to Bone. (J.A. 185.) However, Bone decided not to inform Human Resources. *Id.* Parker continued to "constantly walk[] back and forth behind [her]." (J.A. 140, 267.) Finally, on October 27, 2005, Mullins suffered a severe nervous breakdown following two incidents. First, Parker drove his forktruck "within about an inch of [Mullins'] buggy," causing her to fear for her safety. (J.A. 267-68.) Second, Parker followed her even as she "tried to get away from him." (J.A. 271.) Eventually, he followed her to the break room where he and Jones physically blocked her exit from the break area. *Id.*

Mullins "completely fell apart at work" that day, and her husband took her to a physician who advised her husband to "get her out of there." (J.A. 273-74.) Since then, Mullins has been unable to work and was diagnosed with Post-Traumatic Stress Disorder. (J.A. 330.) She cannot sleep, clean, or cook. (J.A. 278) She has become fixated on the harassment "[b]ecause [she] can't stop thinking about this. Ever. Ever. It's all [she] think[s] about." (J.A. 278, 280-81, 302-03.) She takes Xanax, an anti-anxiety drug, (J.A. 282), and says that she wants to "lay down and go to sleep and never wake up." (J.A. 283.)

## II.

This Court reviews a district court's grant of summary judgment *de novo*. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999). Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering "whether the evidence presents a sufficient disagreement to require submission

to a jury or whether it is so one-sided that one party must prevail as a matter of law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202 (1986), this Court must construe all evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).

III.

The district court dismissed Mullins' Title VII claim on summary judgment, finding that although the facts alleged created a jury question as to whether the alleged actions were sufficiently severe or pervasive to alter the terms and conditions of her employment, Mullins failed to establish employer liability for coworker harassment. (J.A. 383-405.) On appeal, Mullins contends that the district court erred because it (1) applied the incorrect legal standard for establishing employer liability and (2) ignored key factual disputes that created a genuine material issue to be decided by the jury.

An employer is liable for coworker harassment only if it (1) "knew or should have known of the charged sexual harassment" and (2) "failed to implement prompt and appropriate corrective action." *Hafford v. Seidner*, 183 F.3d 506, 513 (6th Cir. 1999) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 804 (6th Cir. 1994)). In determining employer liability for coworker harassment, I agree with the majority that the appropriate standard is indifference. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 338 (6th Cir. 2008) (holding that "when coworker harassment

is at issue, an employer is not liable for 'mere negligence,' but is liable 'if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known.'").

The district court granted summary judgment for Goodyear because it found that (1) Mullins did not put Goodyear on notice of the sexual harassment (J.A. 404) and (2) Goodyear acted reasonably to end the harassment. (J.A. 404-05.) On appeal, Mullins argues that the district court ignored key factual disputes and erroneously viewed the evidence in the light most favorable to the *moving* party.

## A.

The district court found that Goodyear did not have the requisite knowledge of Mullins' complaints of sexual harassment because "[Mullins'] statement that she and Jones had had 'issues' was not sufficient to put [Goodyear] on notice that Jones had allegedly been sexually harassing [Mullins] for years, and it is also not evidence of [Goodyear's] indifference toward the alleged harassment." (J.A. 404.)

As mentioned above, in order to establish employer liability for coworker harassment, the plaintiff must first show that the employer knew or should have known of the alleged harassment. *Hawkins*, 517 F.3d at 338. In determining whether an employer possessed the requisite knowledge of harassment, constructive knowledge is sufficient, *id.* at 340, and "the plaintiff need not report the offensive conduct of co-workers to prevail." *Wanchik v. Great Lakes Health Plan, Inc.*, 6 F. App'x 252, 264-65 (6th Cir. 2001) (unpublished) (finding that even though plaintiff did not report the co-

worker harassment to her employer, there were enough other reports of harassment as to "impute constructive notice to [the] employer").

The district court and Goodyear claim that there was no knowledge, or even constructive knowledge, because Mullins never complained of the sexual harassment to Goodyear. Although Mullins never told Goodyear that Jones had made remarks about her breasts hundreds of times, grabbed and forcibly hugged her, forcibly kissed her, and called her a "stupid bitch," (J.A.116, 392-93), Mullins attempted to report her previous issues, but Harris, a Goodyear manager, expressly told her not to talk about other issues.[10] (J.A. 116.) With Harris's explicit direction not to talk about the issues that she had "been having for years," it was not unreasonable for Mullins to believe that Goodyear did not want to hear about the previous harassment. "An employer cannot avoid Title VII liability for coworker harassment by adopting a 'see no evil, hear no evil' strategy." *Ocheltree v. Scollon Prod., Inc.*, 335 F.3d 325, 334 (4th Cir. 2003) (imputing employer knowledge where plaintiff attempted to inform her employer of sexual harassment on several occasions, but the employer refused to listen). When an employer "knew, or upon reasonably diligent inquiry should have known, of the harassment and failed to take immediate and appropriate corrective action," the plaintiff has satisfied the knowledge requirement. *Fleming v. Boeing Co.*, 120 F.3d 242, 246 (11th Cir. 1997) (quoting *Faragher v. City of Boca Raton*,[11] 111 F.3d 1530, 1535 (11th Cir. 1997)).

---

[10]Another female employee, Lee O'Dell, previously worked on Mullins' shift, but transferred specifically "to get away from [Jones and Parker]" because "it was horrible." (J.A. 262.)

[11]*Faragher* was later reversed on other grounds. *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

Here, a reasonable jury could find that (1) Goodyear, knowing that Mullins was being treated differently, that she was the only woman on her shift, and that she and Jones had "had issues for years," should have made an inquiry as to sexual harassment and (2) Goodyear should not have stopped Mullins from reporting past sexual harassment. If Harris had been at all diligent in discharging his duties as required by Title VII, it would be reasonable to expect that Harris, who admitted that he considered Mullins' complaint to be "centered around employee-retaliation issues," (J.A. 190), would have allowed Mullins to report past problems with Parker and Jones in order to determine the cause of that employee retaliation. In short, a reasonable jury could find that Goodyear knew or should have known about the harassment. Whereas an employee has a duty to report sexual harassment, an employer should not be allowed to evade liability by silencing an employee from disclosing past incidents, especially given her reports of workplace harassment.

Because "[s]ummary judgment requires the court to view all evidence in the light most favorable to the nonmoving party and is appropriate only if the evidence in the record is so one-sided that no reasonable jury could find for that party," *Hawkins*, 517 F.3d at 339 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 251-52, 106 S. Ct. at 2512), we must view the evidence of Goodyear's knowledge in the light most favorable to *Mullins*. A reasonable jury could find that Goodyear was at least indifferent to the existence of harassment. The district court discredited the fact that Mullins stated that she and Jones "had had issues for years" because "[Mullins] made no effort to explain what the prior 'issues' were." (J.A. 403.) Drawing all reasonable inferences in the light most favorable to Mullins, however, it is reasonable to assume that Goodyear's discouraging

Mullins from explaining why she and Jones had issues for years was not the action of an employer who was reasonable and diligent in preventing and addressing sexual harassment, especially given her complaints that she was targeted by Jones and Parker and because they knew she was the only woman on her shift. Thus, contrary to what the majority glibly concluded, there is a genuine issue of material fact as to whether Goodyear knew or should have known that its employees were sexually harassing Mullins.

B.

Given at least a jury question as to whether knowledge of sexual harassment can be imputed to Goodyear, the next element required to establish employer liability is determining whether the "employer's response is unreasonable" such that it "manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Hawkins*, 517 F.3d at 340 (citing *Blankenship*, 123 F.3d at 873). "A response is generally adequate . . . if it is 'reasonably calculated to end the harassment.'" *Id.* (quoting *Jackson v. Quanex Corp.*, 191 F.3d 647, 663-64 (6th Cir. 1999)). "If the employer responds in good faith, it cannot be held liable." *Rudd v. Shelby County*, 166 F. App'x 777, 778 (6th Cir. 2006) (unpublished) (citing *Blankenship*, 123 F.3d at 873). "[T]he appropriateness of a response depends on the severity of the alleged harassment." *Blankenship*, 123 F.3d at 872.

The district court determined that Goodyear was not indifferent towards the alleged harassment based on the following alleged facts: (1) Goodyear tried to minimize Parker's contact with Mullins; (2) Griffith and Bone were instructed to increase their supervision of the bead area;

(3) Griffith followed up with [Mullins] after the investigation; and (4) Mullins did not give Goodyear an opportunity to respond to further harassment because she did not return to work after Parker drove his forklift close to her and Jones and Parker physically blocked her exit from the break room. (J.A. 404.)

The central flaw in the district court's and the majority's analysis is that they ignored key facts and failed to view the evidence, as they were required to do, in the light most favorable to Mullins. First, although the district court stated that Goodyear tried to minimize Parker's contact with Mullins, it is not clear from the record that Goodyear actually did so. Supervisors Griffith and Bone stated that they imposed a temporary separation during the course of the investigation, (J.A. 151, 182), but accounts differ as to what happened after the investigation. Whereas Griffith stated in his deposition that after the investigation, the "restriction had been lifted," (J.A. 175), Harris testified that the separation "was not lifted." (J.A. 206.) Despite Harris's understanding that the separation was never lifted, Griffith told Parker that it "was okay to go back in that area and work, but he needed to limit his dealings with [Mullins]." (J.A. 327.) Whereas Griffith testified that Mullins repeatedly told him that "things were better," (J.A. 172), Bone testified that Mullins complained every time Parker came into her area, but that he decided not to do anything about her complaints and consciously decided not to report them to his supervisor. (J.A. 183.) Thus, given the inconsistencies in Goodyear's testimony, there is a genuine issue of material fact as to whether Goodyear exhibited indifference by failing to minimize Parker's contact with Mullins.

Second, there is reason to question whether Goodyear responded to Mullins' initial complaints in good faith. During the course of the investigation, both of Mullins' witnesses corroborated her report that Parker had sabotaged her machine. (J.A. 199-201.) Mullins' coworker, Davis, stated that Parker actually laughed and bragged to him about deliberately placing half-rolls of wire onto Mullins' machine in order to make her change her wire spools more frequently. (J.A. 350.) Yet Goodyear still concluded that the allegations of machine tampering could not be corroborated. (J.A. 159.) Goodyear disciplined neither Parker nor Jones. Instead, Goodyear decided to turn the tables and subject *Mullins'* work record to close scrutiny, questioning *her* about her bathroom breaks and productivity. (J.A. 161, 265-66.) This scrutiny arose even though Goodyear admitted that Mullins' work record was "average." (J.A. 161.) Goodyear's alleged reason for questioning her work habits was that they thought her complaints might have arisen because was not "busy" enough and her mind was "wander[ing]." *Id.* Goodyear's dismissing Mullins' reports as those of a worker with a "wandering" mind suggests indifference sufficient to create a jury question as to employer liability.

Third, although the district court claims that Goodyear never had an opportunity to respond to Mullins' complaints prior to her final day of work, it is not clear from the record that this was actually true. As stated above, Goodyear had notice, based on her continual complaints that Parker was in her area, that its "separation" was not working and was bothering her.[12] (J.A. 183.) Bone

---

[12]Although Goodyear claimed that just complaining about someone's presence is not a complaint of actionable harassment, it is significant that Parker continued to hang around Mullins' work area even though, in taking the facts in the light most favorable to Mullins, that separation was

himself stated in his deposition testimony that Mullins complained about Parker's presence, stating that "[e]very time that Red was moved back over, [Mullins] said, 'He ain't supposed to be over here.'" (J.A. 183.)

Mullins also told her supervisor, Bone, that Parker was driving his forklift too close to Mullins and scaring her. (J.A. 185.) Although Goodyear argues that it had no notice of Parker's use of driving equipment to intimidate Mullins, Bone, her supervisor, plainly testified that Mullins specifically complained about this problem, but that he decided not to inform any other Goodyear supervisors of the problem.

> Q. Did she ever complain to you that [Parker] was driving or operating any equipment too close to her?
> A. Yes, she mentioned that.
> Q. And did you tender that to Human Resources?
> A. No.

(Bone Depo., J.A. 185.) Bone, rather than talking to Parker or reporting the complaints to his supervisor, chose to remain silent on the issue until Mullins was almost hit by Parker's forklift. Because Goodyear did nothing to prevent Parker from engaging in physical intimidation, Mullins was constantly fearful, stating that she "had to keep an eye on [her] machine while it was running,

---

not lifted. Parker's continued presence, therefore, was evidence of open disobedience, and Goodyear's failure to address his refusal to maintain a separation from Mullins suggests deliberate indifference to Mullins' underlying complaints of harassment. Moreover, Mullins did not merely complain about Parker's presence. As discussed below, Mullins also complained to her supervisor, Bone, that Parker was driving his vehicle too close to Mullins, making her fear for her physical safety.

and then, [Mullins] had to keep a constant vigil on wherever Red Parker was because [Mullins] was

terrified of Red Parker." (Mullins Depo., J.A. 269.)

> Thus, the district court mischaracterized the facts when it found:

> Although [Mullins] now says that Parker and Jones continued harassing her [after the investigation], she did not make any complaints to Griffith or Harris. When [Mullins] told Bone that she thought Parker was in her area more than he should be and that Jones was not relieving her for breaks as he should, Bone addressed those issues with [Mullins], Parker, and Jones. Plaintiff began her medical leave on the same date that she says that Parker drove a forklift close to her and that Jones and Parker stood outside the break room and partially blocked her exit, without giving Defendant an opportunity to address the incidents.

(J.A. 402-03.) In fact, Mullins complained not only about Parker's continued presence in her work

area, but also about Parker purposely driving his fork lift close to Mullins so as to put her in physical

danger *prior to her last day at Goodyear*. Goodyear never responded to Parker's complaints with

any meaningful action.[13]

Although an employer's response does not have to be perfect in order to be sufficient, (1)

ignoring witness corroboration of Mullins' allegations, (2) subjecting Mullins' own work record,

which was not even an issue, to intense scrutiny, and (3) ignoring Mullins' continued complaints of

Parker's violations of the post-investigation separation and his driving the fork lift dangerously close

to Mullins demonstrates that there is at least a jury question as to whether Goodyear's response was

appropriate and in good faith. In short, a reasonable jury could find that Goodyear's response

---

[13]The majority's inaccurate statement that "Goodyear did not have the opportunity to address [Mullins'] final working-day concerns" is thus directly and irreconcilably contradicted by the fact that Mullins had complained about Parker driving dangerously close to her person well before her final day at work.

"exhibited such indifference as to indicate an attitude of permissiveness that amounts to discrimination." *McCombs v. Meijer, Inc.*, 395 F.3d 346, 353 (6th Cir. 2005). Given the above factual allegations suggesting that Goodyear refused to hear reports of sexual harassment, never took Mullins' initial complaints seriously, knew about the ongoing harassment after their investigation, and consciously decided not to do anything about it, there are genuine issues of material fact for which a reasonable jury could find that Goodyear exercised deliberate indifference on coworker harassment.[14]

IV.

Regardless of whether or not individual judges on this panel personally object to sexual harassment claims in general, the district court made a specific factual finding that was fully supported by the record on summary judgment: "[Mullins] has pointed to evidence in the record which would allow the trier of fact to find that the charged sexual harassment had the effect of unreasonably interfering with [Mullins'] work performance and creating an intimidating, hostile, or offensive working environment." (J.A. 392) (internal quotations omitted). Viewing the facts alleged in the light most favorable to the *nonmoving*, not the moving, party, the record creates a jury question as to whether defendant Goodyear is liable for the sexual harassment that its employees inflicted on Mullins. The majority, by effectively immunizing employers that are indifferent to such serious and

---

[14]Although Goodyear and the majority argue that Goodyear's remedial actions were adequate because Mullins focused on Goodyear's failure to stop Parker, not Jones, from continuing his harassment, Appellee br. p.29, this argument is not particularly cogent. Mullins complained about both Parker and Jones, and both Parker and Jones were involved in the final incident that led to her breakdown.

appalling patterns of sexual harassment from Title VII complaints, has scored a substantial victory

for all those who believe that women do not belong in the workplace.  I **dissent**.