BERNICE BOUIE DONALD, Circuit Judge
I.
This appeal arises out of a 42 U.S.C. § 1988 race-based hostile work environment claim brought against current and former employees of the Michigan Department of the Attorney General. The Plaintiff-Appellee, Sonya Bradley, who is African American, initially brought suit against Steve Arwood, William Schuette, Susan Przekop-Shaw, Peter Kotula, and Frank Russell on June 12, 2014, raising claims including the one currently before this Court. On Defendants’ Motion to Dismiss, the district court dismissed all of Bradley’s claims except her hostile-work-environment claims against Przekop-Shaw and Kotula. Bradley thereafter filed an amended complaint adding Debbie Taylor as an additional defendant. After discovery, the remaining defendants, including Przekop-Shaw, filed a Motion for Summary Judgment. The district court granted the motion with respect to Kotula and Taylor, but denied the motion with respect to Przekop-Shaw, finding that Bradley presented sufficient evidence to raise a genuine dispute of material fact as to whether Przekop-Shaw had created a race-based hostile work environment. Przekop-Shaw interlo-cutorily appeals the district court’s order denying her qualified immunity. For the reasons set forth herein, we affirm..
II.
Viewing' the record evidence in the light most favorable to Bradley, the facts of this case are as follows. As of 2010, Plaintiff Bradley worked as a legal secretary at the Michigan Department of the Attorney General in the unit handling revenue and collections issues in Detroit. (R. 43-2, ID 465). In January 2011, she was hired as a division legal secretary supervisor overseeing the Unemployment Unit of the Attorney General’s office. (R.43-2, 465-66). Bradley technically worked for the Department of Licensing and Regulatory Affairs (LARA), but was detailed back to the Attorney General’s Detroit office. (Id. at 665-66). Bradley supervised five legal secretaries in the Detroit office, all African-American, and a sixth secretary, who was white, in the Unemployment Unit in the Grand Rapids office. (R. 43-2, ID 466; R. 45-4, ID 666).
In February 2011, Bradley met with her then supervisor, Donna Welch, and Przek-op-Shaw, who was Welch’s supervisor at the time, in order to discuss Bradley’s annual objectives. (R. 45-4, ID 666). During the meeting, Bradley’s first assignment was discussed—converting all of the Detroit office Unemployment Insurance Agency (UIA) files, several thousand of them, from a manual system to a computerized system. In response to Bradley’s request for additional secretarial staffing to complete the task, Przekop-Shaw suggested bringing on Michael Lockman, a Caucasian male attorney, who had previously worked at the Michigan Attorney General’s office, as had both Bradley and Przekop-Shaw. (R. 46-5 753). Lockman had allegedly racially harassed Bradley in 2010. In fact, Bradley averred in her affidavit that she applied for the position in the Unemployment Unit after Lockman yelled to her “bring your black ass back in here” as she was leaving work one day. (R. *413 45-4, ID 665).[1] Bradley asserts that Przek-op-Shaw knew of Lockman’s harassment and used the possibility of moving Lock-man into the Unemployment Unit to harass and intimidate her. Bradley alleges that Przekop-Shaw reissued the threat to hire Lockman after Bradley reported to LARA officials in October 2011 that a government-issued credit card assigned to her had been inappropriately used by an employee in the Attorney General’s office. (R. 45-4, ID 666-67).
In June 2012, Przekop-Shaw replaced Welch as Bradley’s direct supervisor. (R. 43-6, ID 511-12). In September, Przekop-Shaw sent an email to human resources official Frank Russell seeking advice on reclassifying Bradley’s position to a lower grade. (R. 45-6, ID 684-85.) It does not appear from the record that any change was made. However, Bradley acknowledges the job posting for the position at issue may have erroneously assigned a higher classification level than the position was actually due. (R. 43-2, ID 466). Erroneously or not, the position conferred a “level 11” classification, the same as Amy Gonea, a Caucasian woman who was the head secretary of the Attorney General’s Labor Division office in Lansing. (Id.; R. 43-6, ID 517; R. 45-7, ID 687). Bradley claims that in spite of their equal classification, Przekop-Shaw treated Gonea more favorably than Bradley, improperly allowing Gonea to supervise Bradley.
This issue came to a head in the wake of a second incident related to Bradley’s government-issued credit card. In November 2012, Gonea asked for Bradley’s card information in order to set the card up for the entire Unemployment Unit to use for e-filing charges and purchases. (R. 45-4, ID 668; R. 45-7, ID 689). Bradley contacted a LARA purchasing manager and the Department of Technology, Management, and Budget, who advised her not to provide the credit card information to Go-nea and instead follow a LARA procurement policy. (R. 45-4, ID 668; R. 45-7, ID 688-89.) This upset Przekop-Shaw, who in a strongly worded email, admonished Bradley that Bradley’s actions were “unacceptable” and accused her of intentionally circumventing and undermining her supervisors in the Attorney General’s office. (R. 45-4, ID 668; R. 45-7, ID 687-88.) Przekop-Shaw forwarded this email to Frank Russell, a human-resources official, who stated that a Formal Counseling Memorandum would have been appropriate in this situation. (R. .45-7, ID 687). But Russell went on to state that he believed that Bradley acted in this manner because she was upset at “having to abide by a peer’s ([Gonea’s]) direction. Regardless of whether she is classified properly or not, ‘currently,’ she is the same level (I think).” (Id.)
According to Bradley, Przekop-Shaw also made her “jump through hoops” to take leave, and would “bombard” her with assignments if she requested time off. (R. 43-2, ID 472; R. 45-4, ID 667.) Bradley testified that, on one occasion, she asked for a day off so that she could take her mother to a medical appointment. (R. 43-2, ID 472, 478.) Przekop-Shaw reluctantly approved the request. (Id. at 472, 478.) Then, despite Bradley’s leave having been scheduled two weeks in advance, Gonea called Bradley at the very end of the workday *414 prior to her scheduled day off and ordered her to complete a “whole list” of tasks. (Id. at 478.) Bradley had to stay several hours late to do so. (Id. at 474.) Further, when Bradley was on extended medical leave in 2013, Przekop-Shaw “harassed] [Bradley] via telephone and email requesting [her] to perform [work] duties” from home. (R. 45-4, ID 668-69.) In accordance with medical advice, Bradley refused to do so. (See id. at 669.)
Meanwhile, as early as February 2011, Bradley’s supervisors instituted regular meetings and communications with Bradley related to her performance. (R. 43-6, ID 514-15). Przekop-Shaw states that these were set up to improve Bradley’s performance, which had been noted as problematic since her initial performance evaluation by Welch. (Id.) Bradley asserts that these meetings were attempts to embarrass and ridicule her in front of her colleagues. (Appellee’s Br. at 7.) Bradley also asserts that Przekop-Shaw imposed unreasonable demands and set unrealistic deadlines all while refusing Bradley’s request for additional staffing just to ensure that Bradley would not be successful. (Id.)
Bradley’s performance evaluations present a conflicting picture. During Bradley’s first performance appraisal in March 2012, Welch, her initial supervisor, reported that Bradley “meets expectations.” (R. 43-5, ID 502-07). However, in an email dated January 10, 2013, Welch noted that Bradley had begun to engage in negative behavior as early as 2011. (R. 43-4, ID 501). Also in January 2013, Przekop-Shaw reported in Bradley’s annual review that overall Bradley “meets expectations,” but added that Bradley was having some negative performance issues. (R. 43-6, ID 513; R. 43-7, ID 524-35). Bradley alleges that these comments were insulting and belittling, and were further evidence of harassment (Appellee Br. 7-8); however, Przekop-Shaw asserts that they were specifically related to Bradley’s performance problems. (Appellant Br. 9-10; R. 43-7, ID 524-35). Bradley asserts that even as Przekop-Shaw criticized Bradley for not effectively managing her time, prioritizing her tasks, or timely accomplishing tasks, Przekop-Shaw denied requests for additional staffing or assistance for the all-black Detroit secretarial staff. (Appellee Br. 8).
In September 2013, after determining that Bradley failed to improve, Przekop-Shaw provided her with additional performance objectives. (R. 43-2, ID 481). Bradley highlights this as further harassment, pointing out that her weekly requests for assistance had been ignored. (Appellee’s Br. at 8.) One month later, in October 2013, Bradley gave a presentation to the entire Labor Division staff. (R. 43-6, ID 517-18). Although Bradley claims it was well-received, (Appellee’s Br. at 9), Przek-op-Shaw stated that the presentation, though intended to foster team building, fostered division as it did not recognize the work of a secretary in the Grand Rapids office or anyone outside of Detroit. (R. 43-8, ID 537-38). Bradley responds to this claim by explaining that the secretaries on her team were the subject of her presentation and that the Grand Rapids secretary no longer worked under her. (Appellee Br. 9-10). In a. Notice of Formal Counseling issued in response to the presentation, Przekop-Shaw also claimed that Bradley inappropriately complained during the presentation about her workload and pressured others to help her perform her tasks so that they would be considered team players. (Id.)
In February 2014, Bradley received a “needs improvement rating” during her annual review, which noted that Bradley had failed to meet the performance objectives issued over the past year. (R.43-6, ID 521; R. 43-9, ID 541). As a result, Bradley *415 was placed on a Performance Improvement Plan, overseen by Bradley’s new di-. reet supervisor Peter Kotula, a white attorney who was based in the Detroit office. (R. 43-6, ID 521; R. 43-11, ID 559-60; R. 43-12, ID 562-63). In response to these actions, Bradley filed a grievance and an Equal Employment Opportunity complaint based on racial discrimination and harassment. (Appellee Br. 10). In April 2014, citing a lack of improvement, Kotula issued Bradley a second Notice of Formal Counseling. (R.43-11, ID 560; R. 43-13, ID 565-66). In September 2014, Kotula gave Bradley an interim rating of “Unsatisfactory” and advised her that she would be terminated if her performance did not improve in accordance with her Performance Improvement Plan. (R. 43-14, ID 568-69). In November 2014, Bradley was also issued two written counseling memos, citing her lack of improvement. (R. 43-15, ID 571-72; R. 43-16, ID 574-75). At the same time that she received these counseling memos, Bradley also received an unsatisfactory interim rating in her follow-up review, which noted that Bradley was still failing to meet performance objectives. (R. 43-18, ID 583-86). Bradley received a third written counseling on December 4, 2014. (R. 43-17, ID 577-81). As a result of continued lack of improvement, Kotula again rated Bradley’s performance as “Unsatisfactory” and extended her review period through March 2015. (R. 43-19, ID 588-90).
In February 2015, Bradley received her fourth and final written counseling memo as well as another unsatisfactory progress review from Kotula. (R. 43-20, ID 592-94; R. 43-21, ID 596-604). Bradley claims to have received the fourth counseling memo for seeking help from Kotula to interpret a directive (Appellee Br. 12), but Kotula characterized Bradley’s conduct as “accusatory” and “unprofessional.” (R. 43-20, ID 592-94). As a result of her failure to meet the objectives established in her Performance Improvement Plan issued in spring 2014, Bradley’s employment was terminated effective March 19, 2015. (R. 43-22, ID 606).
III.
Bradley filed this action in June 2014, alleging violations of the First and Fourteenth Amendments, The Civil Rights Act of 1871, and Title VII, along with various state-law claims. (R. 1, ID 1-35). In October 2014, the district court dismissed all but two of Bradley’s claims, allowing her hostile-work-environment claims against Defendants Przekop-Shaw and Kotula to proceed. (R. 14, ID 229-34). In May 2015, Bradley added a claim of racial harassment against Debbie Taylor. (R. 31, ID 326-48). In December 2015, the district court granted summary judgment in favor of Defendants Kotula and Taylor, but denied summary judgment as to Defendant Przekop-Shaw, finding that “Plaintiff has provided evidence to support the allegations made in the complaint with regard to” her hostile-work-environment claim against Przekop-Shaw. (R.- 50, ID 821). Przekop-Shaw timely filed this interlocutory appeal, arguing that because Bradley presented insufficient evidence to raise a genuine issue of material fact supporting her claim that Przekop-Shaw engaged in race-based conduct that was severe and pervasive, the district court improperly declined to extend qualified immunity.
IV.
28 U.S.C. § 1291 provides this Court with jurisdiction to hear appeals from “final decisions” of the district courts. However, “a district court’s denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable ‘final decision’ within the meaning of 28 U.S.C. § 1291 notwithstanding the absence *416 of a final judgment.” Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). A defendant “may not appeal a district court’s summary judgment order insofar as that order determines whether or not the pretrial record sets forth a ‘genuine’ issue of fact for trial.” Kennedy v. City of Cincinnati, 595 F.3d 327, 333 (6th Cir. 2010) (quoting Johnson v. Jones, 515 U.S. 304, 319-20, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995)). “[T]he defendant must be prepared to overlook any factual dispute and to concede an interpretation of the facts in the light most favorable to the plaintiffs case.” Berryman v. Rieger, 150 F.3d 561, 562 (6th Cir. 1998). This Court has held that “[w]hen the legal arguments advanced rely entirely on a defendant’s own disputed version of the facts, the appeal boils down to issues of fact and credibility determinations that we cannot make.” Thompson v. Grida, 656 F.3d 365, 367 (6th Cir. 2011) (citing Berryman, 150 F.3d at 564).
However, “regardless of the district court’s reasons 'for denying qualified immunity, we may exercise jurisdiction over the appeal to the extent it raises questions of law.” Williams v. Mehra, 186 F.3d 685, 689-90 (6th Cir. 1999) (en banc) (ellipsis omitted) (emphasis in Williams) (quoting Dickerson v. McClellan, 101 F.3d 1151, 1157 (6th Cir. 1996)). Further, a mixed issue of law and fact, including an “ultimate fact,” such as whether a party’s conduct created a racially-hostile work environment in light of the legal standard, is treated as an issue of law, not an issue of fact. See id. at 690 (citing Whitney v. Brown, 882 F.2d 1068, 1071 (6th Cir. 1989)). Even where the defendant inappropriately attempts to challenge the basic facts, this Court, can “ignore the defendant’s attempts to dispute the facts and nonetheless resolve the legal issue, obviating the need to dismiss the .entire appeal for lack of jurisdiction.” DiLuzio v. Vill. of Yorkville, 796 F.3d 604, 611 (6th Cir. 2015) (quoting Estate of Carter v. City of Detroit, 408 F.3d 305, 310 (6th Cir. 2005)).
Bradley claims that Przekop-Shaw’s appeal “relies solely on her own disputed view” to argue that the district court incorrectly interpreted the facts. (Appellee Br, 1). However, Przekop-Shaw accepts the facts as established by Bradley, arguing that those facts “do not establish a constitutional violation for the purposes of the qualified immunity inquiry.” (Appellant’s Br. 1). In Williams v. Mehra, we noted that “questions concerning Defendants’ conduct—what actions they performed— are questions of subsidiary or basic fact [while] [t]he question of the legal standard ... is a question of law.” 186 F.3d at 690. We then identified a third category, mixed questions of law and fact, over which this court has consistently exercised jurisdiction. Id. As in that case, “[t]he question at issue in this case—whether the specifics of the [Defendant’s] conduct, as alleged by [the Plaintiff], could constitute [a constitutional violation]—is a mixed question of law and fact.” Id. Przekop-Shaw raises a mixed question of law and fact concerning whether the conduct alleged by Bradley satisfies the prima facie requirements for a hostile-work-environment claim. Further, to the extent that Przekop-Shaw challenges the facts as determined below, this Court “can separate an appellant’s reviewable challenges from its unreviewable.” DiLuzio, 796, F.3d at 610 (citations omitted). Thus, we may exercise jurisdiction over this appeal.
V.
“We review the denial of summary judgment on grounds of qualified immunity de novo because application of this doctrine is a question of law." Bletz v. Gribble, 641 F.3d 743, 750 (6th Cir. 2011) (citation omit *417 ted). As this is a review of a motion for summary judgment, we “are required to view the facts and draw reasonable inferences ‘in the light most favorable to the party opposing the [summary judgment] motion.’” Scott v. Harris, 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (citation omitted) (alteration in Scott). However, this duty “does not require or permit the court to accept mere allegations that are not supported by factual evidence.” Chappell v. City of Cleveland, 585 F.3d 901, 906 (6th Cir. 2009) (citation omitted). “When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts.” Scott, 550 U.S. at 380, 127 S.Ct. 1769. In light of this, this panel views the facts and any inferences to be drawn therefrom in the light most favorable to Petitioner Bradley.
When considering whether to extend qualified immunity, this Court must consider whether, when taken in the light most favorable to the plaintiff, the facts alleged demonstrate that the defendants violated a constitutional right, and whether that constitutional right was clearly established. Pearson v. Callahan, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Przekop-Shaw’s position is that Bradley’s claim fails on the first prong. Specifically she argues that Bradley has not demonstrated a constitutional violation because Bradley has not met the prima facie requirements for establishing a hostile work environment.
To establish a prima facie hostile-work-environment claim, Bradley must show that: (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on race; and (4) the harassment unreasonably interfered with her work performance or created a hostile or offensive work environment that was severe and pervasive. Fenton v. HiSAN, Inc., 174 F.3d 827, 829-30 (6th Cir. 1999).[2] In proving hostility, the plaintiff must meet an objective and subjective standard, showing that “the conduct [was] so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim.” Randolph v. Ohio Dep’t of Youth Servs., 453 F.3d 724, 733 (6th Cir. 2006). Przekop-Shaw challenges Bradley’s showing of a prima facie case on the third and fourth prongs.
a. Bradley Has Made A Showing of Racially Motivated Harassment
First, Przekop-Shaw argues that Bradley has failed to establish a prima facie hostile-work-environment claim because she failed to show that any harassment was racially motivated. (Appellant’s Br. at 33-43). When considering whether the third prima facie element has been met, this Court may only consider “harassment based on the plaintiffs .race.” Williams v. CSX Transp. Co., Inc., 643 F.3d 502, 511 (6th Cir. 2011) (emphasis in original) (citation omitted). “A plaintiff may prove that harassment was based on race by either (1) direct evidence of the use of race-specific and derogatory terms or (2) comparative evidence about how the *418 alleged harasser treated, members of both races in a mixed-race workplace.” Id. Thus, a finding of race-based harassment does not require proof that racially derogatory comments were made, but rather Bradley must present evidence that the challenged actions “would not have occurred but for the fact that the plaintiff was African American.” Jackson v. Quanex Corp., 191 F.3d 647, 662 (6th Cir. 1999) (citation omitted). “An example of the latter approach could include evidence that similarly sjtuated individuals of a different race were not subject to harassment.” Pusey v. United Parcel Service, Inc., 393 Fed.Appx. 366, 369 (6th Cir. 2010) (citing Clay v. United Parcel Serv., Inc., 501 F.3d 695, 706-07 (6th Cir. 2007)).
The district court determined that Bradley presented a material issue of fact as to whether she was subject to race-based harassment relying on three interactions between Bradley and Przekop-Shaw. (R. 50, ID 818-19). First, the district court found that Bradley had submitted evidence that created a material issue of fact regarding whether Przekop-Shaw “spitefully threatened” to make Bradley work with Lockman. (Id. at 818). Second, the district court found evidence to support Bradley’s claim that Przekop-Shaw treated Gonea substantially differently from Bradley, though they were classified in the same level and position. (Id. at 818-19). Finally, the district court found that there was evidence to support the allegation that Przekop-Shaw treated other African-American employees differently from their white counterparts, based on Przekop-Shav/s denial of a request from the Detroit office, where the secretaries were all black, for a longer than normal lunch to host a holiday luncheon, even though Przekop-Shaw hosted a similar longer than normal luncheon at her home for the Lansing office, which was all white. (Id. at 819).
Regarding the first assertion, Bradley claims that on two separate occasions, Przekop-Shaw threatened to transfer Lockman into Bradley’s office. According to Bradley, Przekop-Shaw made these statements first in response to Bradley’s request for additional secretarial staff and then in retaliation against Bradley for circumventing her authority by reporting inappropriate use of Bradley’s government issued credit card to LARA management. (R. 45-4, ID 666-67). Although these incidents are not race-based on their face, Bradley contends that they may be understood as such because Lockman had previously harassed Bradley based on her race.
Przekop-Shaw argues that even if she did propose transferring Lockman to Bradley’s unit, which she denies, that should not be considered race-based treatment because there is no evidence in the record that Przekop-Shaw’s alleged actions were racially motivated, and in particular no direct evidence that Przekop-Shaw was aware of Bradley’s history with Lockman.[3] *419 However, the problem for Przekop-Shaw is that there is no other explanation for the threatened transfer. As an attorney, Lock-man was not in a position to alleviate the workload of the secretarial staff, nor would transferring him into Bradley’s unit have been a legitimate response to the misuse of Bradley’s government credit card. Although Przekop-Shaw denies threatening to transfer Lockman, for summary judgment purposes we must credit Bradley’s testimony that she did. Accepting that testimony as true, Przekop-Shaw has not offered any alternative explanation, based on the evidence or common sense, for proposing to transfer Lockman. On this record, a reasonable jury could infer that Przekop-Shaw knew of Lockman’s prior racial harassment of Bradley and used that knowledge to intimidate Bradley by threatening to force her to work with Lockman again, particularly in light of Bradley’s testimony that Przekop-Shaw was “irate” and “upset” after the credit card incident, and that the subsequent threat to transfer Lockman was delivered “spitefully.”[4] (R. 46-5, PID 753-54). It is evident that on this point, this Court has been presented with two contradictory versions by the opposing parties. Scott, 550 U.S. at 380, 127 S.Ct. 1769. However,, neither story “is blatantly contradicted by the record, so that no reasonable jury could believe it.” Id.
The district court also concluded that Bradley “present[ed] evidence that [Przek-op-Shaw] gave her ‘substantially different’ treatment from another Division Legal Secretary Supervisor, Amy Gonea, who is Caucasian.” (R. 50, ID 818). There is evidence in the record supporting Bradley’s claims that she was classified on the same level as Gonea but that Bradley was nevertheless treated as a subordinate to Gonea. In addition to her own testimony, Bradley provided the affidavits of former co-workers who testified that they witnessed Przekop-Shaw’s mistreatment of Bradley and that Prezkop-Shaw treated Bradley differently than Gonea even though they had the same classification. (R. 45-8, ID 694; R. 46-11, ID 786). Such affidavits have been accepted as evidence supporting the inference that race was a “but-for” condition of the plaintiffs treatment. See Clay, 501 F.3d at 706 (finding an inference of race-based harassment where the affiant described with specificity interactions she actually witnessed).
*420 Further, the record also includes the email from Frank Russell, a Human Resources officer, in which Russell states that Bradley appears to be upset by “having to abide by a peer’s (Amy’s) direction.” (R. 45-7, ID 687). He continues that “[r]e-gardless of whether [Bradley] is classified properly or not, ‘currently’, she is the same level (I think).” Id. In explanation for the apparent difference in treatment of the two women, Przekop-Shaw’s counsel explained that Bradley was in fact a subordinate of Gonea’s and that the classification level advertised when Bradley applied and accepted her position was an error. {See also R. 43-6, ID 511, 517, 519; R. 45-7, ID 687-88).
Russell’s email regarding this issue could reasonably be understood to support either Bradley’s claim that she and Gonea shared the same classification or Przekop-Shaw’s position on Bradley’s classification. In a review of a summary judgment decision, this Court is “required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the [summary judgment] motion.” Scott, 550 U.S. at 378, 127 S.Ct. 1769 (quotations and citation omitted). A reasonable jury could conclude from Russell’s email that Gonea and Bradley were effectively peers, that they should have been treated as peers, that Przekop-Shaw was aware of this, and that she treated them differently in spite of this knowledge. Whether Przek-op-Shaw’s differential treatment was due to an error in Bradley’s classification level or to racial animus is a question of fact for a jury to decide. Rather than being blatantly contradicted by the record, Bradley’s claim that Przekop-Shaw treated Bradley less favorably than her white counterpart draws support from evidence in the record. Because “comparative evidence” that an alleged harasser treated peers of different races differently may be used to show that facially neutral treatment is actually race-based, Williams v. CSX Transp. Co., 643 F.3d at 511, Przek-op-Shaw’s more favorable treatment of Bradley’s white peer may be considered evidence of race-based harassment.[5]
Finally, the district court found further evidence that Przekop-Shaw “treated other African-American employees differently from their white counterparts” in the fact that Przekop-Shaw denied the black Detroit secretaries’ request to have a holiday party that exceeded their hour-long lunch break, when Przekop-Shaw herself had hosted a holiday party for the all-white Lansing staff at her home. (R. 50, ID 819). Bradley supported her claim that the all-black Detroit secretarial staff was treated differently from the all-white Lansing staff with testimony from a former co-worker who testified about Przekop-Shaw’s decision to prohibit the Detroit staff from having their Christmas party other than during their lunch hour. (R. 45-8, ID 693). As with the comparative evidence relating to Przekop-Shaw’s treatment of Gonea, this comparative evidence relating to the holiday parties may also be considered in support of Bradley’s claim that she was harassed based on her race.
In addition, Bradley also contends that Przekop-Shaw harassed her by “attempting to downgrade her position, ... berating] her work performance, arbitrarily placing] her on performance-improvement *421 plans, [issuing] groundless counseling statements for asking for assistance, failing to meet with her to discuss her work performance, requiring her to complete unrealistic work assignments before taking annual leave, and denying her comp-time.” (Appellee Br. 16).[6] Przekop-Shaw asserts that this conduct may not be considered in support of Bradley’s race-based hostile work environment claim because “only harassment based on the plaintiff's race may be considered.” Williams v. CSX Transp. Co., 643 F.3d at 511. Because none of this behavior is explicitly race-based, Bradley must show a but-for relationship—i.e., that but for the fact that she is African American, this conduct would not have occurred. Jackson, 191 F.3d at 662.
However, to the extent that this conduct is an extension of Przekop-Shaw’s disparate treatment of Bradley and Gonea, such a link may be permissibly inferred from the evidence. This includes a number of Przekop-Shaw’s most consistent complaints about Bradley’s performance, such as Bradley’s refusal to follow the proper chain of command and work within the management structure, as well as her failure to meet performance objectives that required Bradley to act as a subordinate to Gonea. (See e.g., R. 43-7, ID 524-35; 43-9, ID 545-51; R. 43-10, ID 555; R. 43-12, ID 562-63). Further, because subsequent negative performance reviews often cite a failure to improve on issues raised in prior reviews, the passage of time has a compounding effect. (R. 43-14, ID 568; R. 43-16, ID 574-75; R. 43-18, ID 586) As a result, Przekop-Shaw’s favorable treatment of Gonea at the expense of Bradley became a substantial factor in the series of reviews that culminated in Bradley’s ultimate dismissal. While these reviews are facially race-neutral, they are at least in part a reflection of Przekop-Shaw’s allegedly favorable treatment of Bradley’s white counterpart. That Przekop-Shaw made it difficult for Bradley to take leave and tried to force her to work while on medical leave could be viewed by a jury in the same light. Thus, Bradley has presented evidence that “create[s] an inference, sufficient to survive summary judgment, that her [race] was the motivating impulse for [Przekop-Shaw’s] behavior.” Williams v. General Motors Corp., 187 F.3d 553, 565-66 (6th Cir. 1999).
Przekop-Shaw also notes that Bradley testified to the fact that employees of different races, including white employees, were subject to harsh treatment by Przek-op-Shaw. (Appellant’s Br. 33-34 (citing R. 43-2, ID 467-472)). That evidence may persuade a jury that Przekop-Shaw’s actions were not race-based. But it does not moot the fact issue created by Przekop-Shaw’s disparate treatment of Bradley and Gonea.
b. Bradley Has Made a Showing that the Racially-Motivated Actions Were Sufficiently Severe or Pervasive
.Next, Przekop-Shaw argues that Bradley was not subjected to a severe and pervasive hostile work environment. The severe and pervasive requirement contains an objective and subjective component. Gallagher v. C.H. Robinson Worldwide Inc., 567 F.3d 263, 273-74 (6th Cir. 2009). To meet this requirement, Bradley must show that an objectively hostile environment existed and that she subjectively experienced severe and pervasive harassment. Id. (citing Williams v. General Motors, 187 F.3d at 568). “Al *422 though the question of whether conduct is severe or pervasive is quintessential^ a question of fact, [this Court] ha[s] earlier affirmed grants of summary judgment, determining that as a matter of law, the conduct complained of was not sufficiently severe or pervasive.” Clay, 501 F.3d at 707 (citations omitted).
“[A] hostile work environment ... typically comprises a succession of harassing acts, each of which ‘may not be actionable on its own.’ ” Id. at 708 (ellipses and brackets in original) (quoting Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 638, 127 S.Ct. 2162, 167 L.Ed.2d 982 (2007)). A court determines whether a hostile work environment has been created “by looking at all the circumstances ... including] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee’s work performance.” Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Title YII “does not set forth a general civility code for the American workplace,” Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), and “conduct must be extreme” to amount to a hostile work environment. Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). However, a “work environment viewed as a whole may satisfy the legal definition of an abusive work environment ... even though no single episode crosses the Title ATI threshold.” Williams v. General Motors, 187 F.3d at 564. A negative performance review, the imposition of a performance improvement plan, or similar actions do not, on their own, show a hostile work environment. See, e.g. Smith v. Leggett Wire Co., 220 F.3d 752 (6th Cir. 2000). However, when “seen as a part of the ‘constellation of surrounding circumstances,’ including [] threatening language” and racially disparate treatment by a supervisor, this conduct “could well be viewed as work-sabotaging behavior that creates a hostile work environment.” Williams v. General Motors, 187 F.3d at 563.
Considering the totality of the circumstances, Williams v. General Motors, 187 F.3d at 562, there is enough evidence to put the question whether Przekop-Shaw subjected Bradley to severe and pervasive race-based harassment to a jury. There is evidence to support the inference that the Lockman incidents, Przekop-Shaw’s treatment of Bradley in relation to her treatment of Gonea, and the holiday party incident were racially-based. Threatening to force Bradley to work with someone who had racially harassed her was more than a mere offensive utterance. In addition, Bradley has provided evidence to suggest that the race-based harassment she suffered included daily interactions, emails, and other communications, barriers to her use of leave, demands that she work while on medical leave, and unfounded negative reviews and counselling memos, all contributing to a “work-sabotaging” hostile work environment. A jury could conclude that Przekop-Shaw’s alleged mistreatment of Bradley as compared to Gonea and the interrelated communications, reviews, and counseling memos resulted, in ongoing harassment. That Bradley was ultimately terminated in no small part because she refused to subordinate herself to Gonea demonstrates the severity of this harassment and that it unreasonably interfered with Bradley’s work performance.
Bradley does more than present a series of isolated offensive events. Rather, she describes “a succession of harassing acts,” and though “each of [them] may not be actionable on its own,” as a whole they are severe and pervasive enough to comprise a hostile work environment. Clay, 501 F.3d *423 at 708. Taken together, the allegations, which Bradley has supported with evidence in the record, portray an environment of almost daily harassment and belittling subordination that persisted and even intensified over a period of years, ultimately resulting in her termination. A reasonable person could, and Bradley did, find such consistent conduct hostile and abusive so as to satisfy the fourth prima facie requirement.
VI.
Because Bradley has demonstrated a violation of her right to a work environment free of racial harassment, we affirm the district court’s order denying defendant qualified immunity and remand for trial.

. At oral argument, Bradley’s counsel stated that the employee who reviewed Lockman’s alleged racist statement was a subordinate of Przekop-Shaw. There is nothing in the record to support this assertion. It is also unclear whether Bradley’s EEOC charges included the Lockman incident. Although Bradley was questioned about her EEOC charges at her deposition, (e.g., R. 43-2, ID 474), neither party submitted the EEOC charges to the district court.

. A plaintiff must also typically show that her employer knew or should have known of the racial harassment and failed unreasonably to take prompt and appropriate corrective action. Fenton, 174 F.3d at 830. That element is irrelevant here because Bradley is suing Przekop-Shaw directly, see, e.g., Hickman v. Laskodi, 45 Fed.Appx. 451, 453 (6th Cir. 2002), and because Bradley’s employer, the State of Michigan, is not a “person” subject to suit under 42 U.S.C. § 1983, see Will v. Mich. Dep't of State Police, 491 U.S. 58, 64, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

. Bradley’s affidavit states in pertinent part only:
2.... That in 2010, I was being verbally harassed by h member of the AG’s Office, Michael Lockman (a white male) and decided to exit to another part of the work area, to which Mr. Lockman shouted "bring your Black ass back in here”. I accepted this bullying and abuse for a period of time but decided to transfer to LARA in the Unemployment Insurance Agency (UIA)....
[[Image here]]
5. That on or about February 2011, I met with Ms. Przekop-Shaw and Ms. Welch ... My first major assignment was to convert the entire Detroit UIA office from manual to the AG’s computerized system.
6. That during the meeting, I mentioned my observation and assessment of the assignment (converting several thousands [sic] files) and that it would be impossible to achieve by the end of the year without "ad *419 ditional support staff’. Ms. Przekop-Shaw immediately demonstrated her knowledge and authority by suggesting to bring Mr. Lockman on as "additional AG staff.”
[[Image here]]
10. [Sometime after October 1, 2011], at a meeting still upset with me for elevating the fraudulent attempt to use my credit card, [Przekop-Shaw] spitefully threatened to again transfer Mr. Lockman to the section in [sic] effort to intimidate me based on race if I did not stop complaining of issues in the office and "disobeying her.”
(R. 46-5, PID 752-54.) At oral argument, Bradley's counsel asserted that "the person who elevated” the issue of Lockman’s alleged harassment was a subordinate of Przekop-Shaw, and that "senior leadership” at the Attorney General’s office was aware of the allegations. Therefore, according to counsel, Przekop-Shaw “certainly” knew about the allegations. But counsel could not point to evidence in the record supporting these claims, so we do not rely on counsel’s factual assertions.

. In concluding otherwise, the dissent loses sight of our obligation to credit Bradley’s testimony and draw all reasonable inferences in her favor. Nothing in the record renders Bradley’s account unbelievable or forecloses the inference that the threats to transfer Lock-man were attempts at racial intimidation. A jury may ultimately believe Przekop-Shaw's version of events—that she did not know about Lockman’s racist remark and never threatened to transfer him to Bradley’s office—but that is not for this court to decide at the summary judgment stage.

. In reaching the contrary conclusion, the dissent improperly draws inferences in Przek-op-Shaw's favor. A jury might conclude from the record evidence that Gonea was Bradley’s supervisor based on their positions in the division, even if their classification was the same. But a single email exchange and a few snippets of deposition testimony is no more conclusive evidence of how Michigan’s civil service system operates than it is conclusive evidence of racial animus. That is why summary judgment is inappropriate.

. The dissent argues that this claim should not be credited because it does not involve a citation to the record. However, the criticism of Bradley’s work performance, the performance improvement plans, and the counseling statements are all well documented. The dissent itself references them in its recitation of the facts.